UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CARLEX GLASS AMERICA, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    No. 3:24-cv-00695 |
| | ) |
| SOMPO AMERICA INSURANCE COMPANY, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

This case arises from a dispute between Carlex Glass America, LLC ("Carlex") and Sompo America Insurance Company ("Sompo") regarding the amount Sompo is required to compensate Carlex under the insurance contract after Carlex's business was damaged during a tornado. Before the Court is Sompo's Motion for Summary Judgment (Doc. No. 65), which is fully briefed and ripe for review (see Doc. Nos. 65-1, 66, 69–71, 74–75). For the reasons that follow, Sompo's Motion (Doc. No. 65) will be denied, and this case will proceed to trial on January 13, 2026 as scheduled.[1]

---

[1] Also, before the Court are Carlex's objections to Sompo's motion for summary judgment (Doc. No. 67), asserting that: (1) Sompo's exhibits in support of its motion are inadmissible; (2) its statement of undisputed material facts was untimely; and (3) many of its statements of undisputed material facts are not in compliance with the Local Rules. On the first point, Carlex's objections are not well-taken. Many of the exhibits were produced by Carlex, rendering its objections to Sompo's use of them on summary judgment meritless. See Churches of Christ in Christian Union v. Evangelical Ben. Tr., 2009 WL 2146095, at *5 (S.D. Ohio July 15, 2009) (noting that, for summary judgment purposes, it is "disingenuous for [a party] to object to copies of documents that it produced") (citation and quotations omitted). Further, Carlex's objections to the remaining exhibits ignore "the 2010 amendments to Rule 56, which eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." Foreword Mag., Inc. v. OverDrive, Inc., 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011). Because Carlex does not "'object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*[,]'" the authenticity and hearsay

I.  **BACKGROUND AND UNDISPUTED FACTS**[2]

Carlex is a glass manufacturer that operates a float glass line in Nashville, Tennessee. (Doc. No. 75 ¶ 1). On March 3, 2020, Carlex's glass manufacturing facility suffered damage from a tornado. (Id. ¶ 2). As a result, Carlex sought compensation from its insurer, Sompo, under the terms of their commercial property insurance agreement ("Insurance Agreement"). (Doc. No. 1-1 ¶ 1).

The Insurance Agreement provides property coverage for Carlex's Nashville location. (See, e.g., Doc. No. 1-1 at 49). Under the terms of the Insurance Agreement, for each occurrence of "the sum total of all loss or damage of the type insured, irrespective of the number of Insured Locations involved, arising out of or caused by any one disaster, 'accident', loss or series of disasters, accidents or losses, arising out of the same or similar causes, except as respects Earth Movement[,]" Sompo provides up to $650,000,000 in coverage. (Id. ¶ 18). The tornado constituted such an occurrence under the Insurance Agreement. (Id.).

The Insurance Agreement also provides coverage for losses related to the following, in relevant part:

---

objections are rejected. Ganesh v. United States, 658 F. App'x 217, 220 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)). On the second, the Court will consider Sompo's statement of undisputed material facts, given it was filed one business day later than required due to clerical error, which did not substantially prejudice Carlex. See Bruce v. Walmart, Inc., 2023 WL 5986126, at *2 (E.D. Tenn. Sept. 14, 2023) (permitting late filing given the short delay and lack of bad faith). On the last point, the Court will not consider statements of undisputed material fact, or responses or replies thereto, that do not comply with the Local Rules. M.D. Tenn. L.R. 56.01(e) (describing what is appropriate to include in a response to the movant's statement of facts); see Weil v. Neary, 278 U.S. 160, 169 (1929) (local rules have the "force of law").

[2] The undisputed facts in this section are drawn from the undisputed portions of the responses to Sompo's statement of facts (Doc. Nos. 71, 75), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1-1) that are not contradicted by the evidence in the record.

**III. TIME ELEMENT COVERAGES**

A.      **Gross Earnings**

We will pay for the actual loss of Gross Earnings sustained by the Insured due to the necessary "suspension" of the Insured's business activities during the Period of Restoration. The "suspension" must be due to physical loss or damage of the type insured against to real or personal property of the type covered, at Insured Locations.

1. Recovery in the event of loss shall be the actual loss sustained, less charges and expenses that do not necessarily continue during the suspension of the Insured's business activities. Consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume the Insured's business activities with the same quality of service that existed immediately preceding the loss. []

B.      **Extra Expense**

We will pay for the reasonable and necessary Extra Expense incurred by the Insured, to resume and continue as nearly as practicable in Insured's "normal" business activities that otherwise would be suspended, due to direct physical loss of or damage caused by a "covered cause of loss" to property at an Insured Location.

Extra Expense, wherever used in this policy, means that amount spent during the Period of Restoration to continue the Insured's business activities, over and above the expenses the Insured would normally have incurred had there been no necessary suspension of the Insured's business activities.

1. Recovery in the event of loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the Period of Restoration:

a. Extra expenses to avoid or minimize the "suspension" of business and to continue operations at the insured Location, or at replacement locations, or temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary location; and

b. Extra costs to minimize the "suspension" of business if it is not possible to continue operating during the Period of Restoration. [].

C.      **Rental Value**

We will pay the Rental Value loss, if any, sustained by the Insured resulting directly from necessary untenantability, caused by direct physical loss or damage of the type insured against to property at Insured Locations.

3

Rental Value means income that would have been earned or incurred as rental income from tenant occupancy, including fair rental value of any portion of the premises which is occupied by the Insured, and continuing "normal" operating expenses incurred in connection with the property at the Insured Location.

1. Recovery in the event of loss is the actual loss sustained by the Insured of the following during the Period of Restoration:

a. The fair rental value of any portion of the property occupied by the Insured;

b. The total anticipated rental income from tenant occupancy of the Insured Location as furnished and equipped by the Insured; and

c. The rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss, all not to include non-continuing charges and expenses. [].

**IV. TIME ELEMENT COVERAGE EXTENSIONS**

If this policy insures "Time Element" loss, as provided by the Time Element Coverages of the policy, the Time Element Coverage Extensions apply as described below.

**C. Extended Period of Indemnity**

This policy extends coverage as provided by Gross Earnings and/or Rental Value to cover the additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred. This coverage commences:

1. On the date the covered property that incurred the loss (except "finished stock") is rebuilt, repaired or replaced and business is resumed or tenant ability is restored; and

2. Ends on the earlier of:

a. The date the Insured could restore business, with reasonable speed, to the level which would generate the earnings amount or rents that would have existed had no loss or damage occurred; or

b. 30 consecutive days after the date determined in C.1. above (unless otherwise indicated in the Declarations section of the policy). [].

4

**28. Professional Fees**

This policy covers the actual loss incurred by the Insured, for reasonable fees paid to the Insured's accountants, architects, auditors, engineers, or other professionals, and the cost of using the Insured's employees for producing and certifying any details contained in the Insured's books or documents, or such other proofs, information or evidence required by us resulting from loss or damage payable under this policy for which we have accepted liability. [].

**TIME Element, cont'd**

**C.** This policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of the policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

(Id. ¶ 17). Pursuant to these terms, Sompo paid Carlex $17,768,200 for the property damage to Carlex's Nashville facility resulting from the tornado. (Doc. No. 75 ¶ 2).

More than three years later, in August 2023, Carlex submitted a spreadsheet to Sompo setting forth a claim for property damage to the float glass line, extra expenses, and time element expenses that it believed came from the tornado damage. (Id. ¶ 3). The claimed damage ranged from $46,236,462 to $68,198,792. (Id.). Sompo responded to Carlex three months later, advising Carlex that the Insurance Agreement does not provide coverage for the time element portion of its claim. (Id. ¶ 4). In response, on February 1, 2024, Carlex sent Sompo a letter challenging Sompo's coverage position and submitting a Sworn Statement in Proof of Loss totaling $65,910,544, including: (1) "Actual Cash Value" of the Carlex property that the tornado damages; and (2) time element losses. (Id. ¶¶ 5, 7).

First, Carlex attributed $42,595,096 of its loss to "Actual Cash Value" for a rebuild of the float line, in the following amounts:

5

| (1) Capital | | |
|---|---:|---:|
| 1. Facility - Mill-water pipe and Gas pipe | 315 | 421.70 |
| 2. Batch house - repair and batch delivery | 4,206 | 4,698.13 |
| 3. Furnace - Cooldown Heatup Demo repair 15yr improvements Raise crown, Cooling upgrade | 23,139 | 22,967.34 |
| 4. Bath - Roof double module, repair | 4,727 | 4,620.39 |
| 5. Lehr - A0 Upgrade , repair | 4,753 | 4,677.23 |
| 6. Cullet /Mainline - repair | 4,825 | 4,564.11 |
| 10. Spur 1 Prototype | 2,000 | 1,959.56 |

(Doc. No. 44-5 at 4). Second, Carlex claimed $23,315,448 in time element damages for lost profits, increased costs, and professional fees. (Doc. No. 75 ¶ 7). According to Carlex's initial evaluation, this calculation came from lost revenue, increased costs of raw materials, outside glass, energy, and cutlet sales, and professional fees that started in March 2020 and continued through the reported time period. (Id. ¶¶ 11–12). Despite Carlex's representations on its property and time element losses, Sompo denied providing coverage under the Insurance Agreement beyond the more than $17 million it initially awarded Carlex. (Doc. No. 1-1 ¶¶ 10–11). It is from this denial of coverage that the instant suit and pending motion arise. (See Doc. No. 1-1).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The

moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

Sompo requests summary judgment on Carlex's breach of contract and declaratory judgment claims. (See Doc. No. 65-1). The Court will address each claim in turn.

1. Count I: Breach of Contract[3]

In Count I, Carlex alleges that Sompo breached the Insurance Agreement by, among other things: failing to acknowledge coverage; failing to conduct an adequate investigation of Carlex's

---

[3] The Court has jurisdiction over Carlex's breach of contract claim pursuant to 28 U.S.C. § 1332(a). Given this, it "must apply the choice-of-law rules of the forum state" to the contract claim. Stone Surgical, LLC v. Stryker Corp., 858 F.3d 383, 389 (6th Cir. 2017); see State Farm Mut. Auto. Ins. Co. v. Norcold, Inc., 849 F.3d 328, 331 (6th Cir. 2017) (choice-of-law rules of the forum state determine what substantive law to apply). Because the Court agrees with the parties that Tennessee

losses; forcing Carlex to perform its own investigation into losses; and purposely delaying its consideration of Carlex's claimed losses. (Doc. No. 1-1 ¶¶ 29–32). Sompo asserts that summary judgment is warranted in its favor on this claim for two reasons: first, because the Insurance Agreement is void due to Carlex's purported concealment and misrepresentations of the proper claim amount; and second, because there is no genuine dispute of material fact that Sompo did not breach the Insurance Agreement, given Sompo does not owe the amount demanded in Carlex's Sworn Statement in Proof of Loss. (See Doc. No. 65-1). The Court's analysis of each argument finish each deficient for summary judgment.

### A. Carlex's Purported Fraud and Misrepresentations

The Court starts with Sompo's argument that the Insurance Agreement is void. In support, Sompo points to paragraph II of Section D of the Insurance Agreement, which provides:

> This policy is void as to all Insured's in any case of fraud by any Insured as it relates to this policy at any time. It is also void if any Insured, at any time, intentionally conceals or misrepresents a material fact concerning:
>
> A. This Policy;
> B. The Covered Property;
> C. The Insured's interest in the Covered Property; or
> D. A claim under this Policy.

(Doc. No. 55-14 at 77). According to Sompo, because Carlex knowingly submitted a false Sworn Statement in Proof of Loss, and intentionally misrepresented facts about its claim, it cannot now bring a breach of contract claim under that very same policy it voided. (Doc. No. 65-1 at 11–12). Carlex disagrees, reasoning that Sompo's arguments fail both procedurally and substantively, because Sompo did not properly plead this as an affirmative defense or counterclaim, and the

---

choice-of-law rules dictate that Tennessee law governs Carlex's breach of contract claim, it will apply Tennessee contract law here without further discussion.
8

evidence contradicts Sompo's position that Carlex committed any fraud or misrepresentation. (Doc. No. 70 at 6–14).

The Court agrees with Carlex. As a threshold matter, Carlex's assertion that Sompo's arguments are outside the scope of this case is correct, given that it has failed to affirmatively plead them as either an affirmative defense to Carlex's breach of contract claim, or a standalone counterclaim. (See Doc. No. 17; see also Doc. No. 73 at 13 (Magistrate Judge denying Sompo's motion for leave to amend to include this theory as an affirmative defense and counterclaim)). Nevertheless, because Carlex does little to develop this argument in its opposition, it is prudent to address Sompo's fraud and misrepresentation arguments on the merits. See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n, 59 F.3d 284, 293–94 (1st Cir. 1995)).

While not addressed by either party, before considering whether the argument that the Insurance Agreement is void is meritorious, the Court must first interpret the terms of the Insurance Agreement governing this question. Under Tennessee law, "[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language[.]" Clark v. Sputniks, LLC, 368 S.W.3d 431, 441 (Tenn. 2012). In interpreting the Insurance Agreement, it is "'subject to the same rules of construction as contracts generally,' and in the absence of fraud or mistake, the contractual terms 'should be give their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" Id. (quoting U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co., 277 S.W.3d 381,

9

386–87 (Tenn. 2009)). Courts should construe insurance policies and their terms "as a whole in a reasonable and logical manner," with language being "examined in the context of the entire agreement." Garrison v. Bickford, 377 S.W.3d 659, 664 (Tenn. 2012). Where the contract language is "clear and unambiguous, the literal meaning controls the outcome of the dispute." Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co., 499 F. App'x 559, 562 (6th Cir. 2012).

Here, the Insurance Agreement plainly states that it is void if there is fraud, intentional concealment, or intentional misrepresentation of a material fact concerning a claim. (Doc. No. 55-14 at 77). In giving these terms their plain and ordinary meaning, this provision demonstrates the parties' intent to exclude intentional concealment or misrepresentation of relevant facts pertaining to the policy, the covered property, interest in the covered property, or a claim under the policy from the Insurance Agreement's coverage. (See id.). Because this language is clear and unambiguous, and the parties do not dispute its meaning, the Court will apply this interpretation to the parties' dispute on this issue. See Cracker Barrel Old Country Store, 499 F. App'x at 562.

Based on this contractual language, Sompo argues Carlex made material misrepresentations about both its property damage and its time element losses in its claim that makes the Insurance Agreement void. For the reasons that follow, neither argument supports summary judgment as a matter of law.

      i.    Property Damage

First, Sompo contends that Carlex materially misrepresented the property damage to the float glass line stemming from the tornado. Specifically, Sompo maintains that Carlex's representations that it had to rebuild or replace almost all of its float glass line, including the batch house, lehr, cullet/mainline, and the spur 1 prototype, are contradicted by its own corporate

10

representative's and employees' testimony stating the opposite. (Doc. No. 65-1 at 12). In response, Carlex does not dispute that those items were not damaged in the tornado. (Doc. No. 70 at 7). Instead, it asserts that the values attributed to those items in its Sworn Statement in Proof of Loss were submitted as part of what Carlex "believed to be a reasonable estimate of the expected costs to repair the tin bath and the furnace," both of which Carlex contends were damaged in the tornado. (Doc. No. 70 at 7).

To the extent Carlex seeks to collect for damages to the mill water, batch house, lehr, cullet/mainline, and the spur 1 prototype, it cannot do so given its admission that such damages are not part of Carlex's claim under Count 1.[4] (See id.). Still, there is sufficient evidence in the record to create a genuine dispute of material fact on whether this is what Carlex sought for reimbursement. Indeed, Carlex has presented evidence showing both that it did not misrepresent property damage to the float glass line, and that it has a credible explanation for how costs for repairing and replacing that line are encompassed under the Insurance Agreement.

Carlex initially points to correspondence showing that Sompo has been aware that some of the items in the Sworn Statement in Proof of Loss did not encompass an itemized list of property damages from the tornado. (Doc. No. 55-3 (counsel for Sompo stating that "Carlex's property damage calculation is based on a 2017 rebuild cost of $43,908,455[,]" but "Carlex did not submit any documentation supporting this claimed rebuild cost")). This evidence indicates that Sompo understood Carlex's Sworn Statement in Proof of Loss to include a global rebuild estimate, rather than an itemized list of tornado-damaged components. (See id.). Second, Carlex has presented evidence that if a repair solution is put in place, the items listed in the Sworn Statement in Proof of Loss would be destroyed and rebuilt, and therefore associated costs would be credited under the

---

[4] Accordingly, the Court need not delve into the other arguments Sompo raises on this issue.

11

Case 3:24-cv-00695   Document 94   Filed 12/10/25   Page 11 of 17 PageID #: 4659

Insurance Agreement. (Doc. No. 71-8 at 19:20–21:1 (expert James Harris ("Harris") discussing damage done to the bath and furnace from the tornado), 33:15-23 (Harris testifying that he believed the tornado to be the cause of production line damage within the furnace)). Specifically, Carlex points to expert testimony that the tin bath and furnace were damaged by the tornado, needed significant repairs, and those repairs would include the associated costs of replacing the listed items. (See, e.g., id.).

To the extent that Sompo takes the position that the Insurance Agreement does not encompass rebuild costs like the ones Carlex included in its Sworn Statement in Proof of Loss, it fails to develop that argument through any substantive contract interpretation or analysis that would carry Sompo's burden at this stage. See McPherson, 125 F.3d at 995–96. Accordingly, the Court assumes, for summary judgment purposes only, that Carlex's interpretation of the scope of coverage in the Insurance Agreement has merit. In doing so, and in viewing the cited evidence in Carlex's favor, the Court cannot conclude as a matter of law that Carlex materially misrepresented its property damage losses encompassed under the Insurance Agreement such that it is void. (See Doc. No. 55-14 at 77).

        ii.    Time Element Loss

The same is true for Sompo's second argument, that Carlex has made material misrepresentations regarding its alleged time element loss. On this issue, Sompo relies on various pieces of evidence showing that Carlex artificially inflated its time element loss calculation, including: (1) portions of David Rasey's ("Rasey") deposition testimony, Carlex's plant controller, stating that Carlex inflated its time element loss claim; (2) testimony that Carlex relied on "extra expenses" in its spreadsheets that it falsely asserted already occurred; (3) Carlex's corporate representative's testimony that its insurance claim included money related to Covid-19 conditions,

not the tornado; (4) Carlex having previously submitted the same loss data to Continental Casualty in support of an unrelated claim stemming from a June 2019 power outage at its facility; and (5) deposition testimony countering Carlex's representation that it lost substantial revenue due to the tornado. (Doc. No. 65-1 at 14–16). According to Sompo, because these pieces of evidence show that Carlex's time element loss calculation was false in some form or another, the Insurance Agreement is void. (See id.).

Sompo may very well be right if its representations of the record were all that existed. However, that is not the case. Rather, when viewing the evidence in the light most favorable to Carlex, much of the evidence in the record demonstrates that Carlex did not materially misrepresent its time element loss amount. For instance, Carlex points to the testimony of Rasey describing how he made the time element loss calculation on behalf of Carlex. Specifically, Rasey stated:

> Q: So I believe you said you were on a fact-finding mission; is that right?
> A: Yeah, we were looking for the data, right. We're trying to connect.
> Q: To trying to increase the claim?
> A: Well, no. I don't think increase. Just report data that, here's the operational performance. This day on Thursday was 53 percent yield on that day.

(Doc. No. 71-5 at 51:22–52:5). It also relies on Rasey's deposition testimony explaining what Carlex instructed him to do in order to calculate the time element loss. On that point, Rasey testified that:

> Q: So what exactly were they asking you to do?
> A: Just go into the raw -- like the float production reports, go into the records, look and see, you know, what's -- you know, what were the freight costs during this time period. What was the float production results at this time period. If we were running, what the historical yield should have been at were at. What's that delta between the actual yield and what the -- what it should have been.
>
> Let's say, you know, right before we did -- before the tornado, like before the tornado if it was like 70 percent or 72 percent yield, and now it's at 50; the delta is 20 base points. There was a dollar factor. We knew what it was. For every point

13

> of yield, there's a dollar factor that was costing Carlex money. And we'd put it on a spreadsheet, sent it to them, and they reviewed it.

(Id. at 54:14–55:8). Further, Carlex emphasizes Rasey's testimony explicitly rejecting the notion that the claim amount was fraudulent. (See id. at 61:17–62:4 (testifying that he "[n]ever felt [the claim amount] was fraudulent[,]" but was maybe "inflated, maybe overstated")).

To further counter Sompo's contention that Carlex materially misrepresented its time element losses, Carlex points to other evidence, including: (1) Teddy Woodburn's and Pyxis's analysis of Carlex's data, which Carlex used to calculate its time element loss claim (see Doc. No. 70-1); (2) Sompo corporate representative Michael Sweeney's testimony that Carlex "would have began production" on March 14, 2020 if the tornado had not occurred on March 3, 2020, despite Covid-19 conditions (Doc. No. 71-9 at 98:6–9); (3) Harris's testimony that Carlex has not attempted to conceal the facts regarding the power outage from June 2019 (Doc. No. 71-8 at 123:9–25 (Harris testifying that he looked at the power failure to determine whether there was "a connection between what occurred with the power in 2019 and the bath," and deciding he does "not believe that the bath suffered any damage as a result of the 2019 power failure")); and (4) testimony from Alex Rotolo, Carlex's Chief Financial Officer, that Carlex's yields never got back to pre-tornado levels (Doc. No. 71-1 at 28:4–29:19).

Viewing all of this in Carlex's favor, a reasonable juror could conclude that Carlex relied on credible information in calculating its time element losses and did not materially misrepresent those losses, as defined in the Insurance Agreement. Cracker Barrel Old Country Store, 499 F. App'x at 562. Given this, Carlex has presented sufficient evidence to create a genuine dispute of material fact on this issue such that this Court cannot resolve it. Accordingly, summary judgment will not be granted on this basis.

### B. Whether Sompo Breached the Insurance Agreement

Having determined there is at least a genuine dispute of material fact on whether Carlex's representations on its property damage and time element losses void the Insurance Agreement, the Court turns to the merits of Carlex's breach of contract claim. To establish a claim for breach of contract under Tennessee law, Carlex must prove: "(1) the existence of an enforceable contract, (2) the nonperformance amounting to a breach of contract, and (3) damages caused by a breach of contract." BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006); see also Life Care Ctrs. Of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996) (reciting the elements for a breach of contract claim under Tennessee law). Because Sompo challenges only the second element, the Court will limit its analysis to that element as well.

Here, Sompo argues that Carlex cannot create a genuine dispute of material fact on whether Sompo breached the Insurance Agreement because it is undisputed that Sompo does not owe the amount demanded in Carlex's Sworn Statement in Proof of Loss. (Doc. No. 65-1 at 17). In support, Sompo relies on the same evidence as it does in its previously raised arguments about Carlex's alleged misrepresentations regarding its property damage and time element loss; as well as other evidence on Carlex's failure to show actual loss of gross earnings and sales from the tornado, including inappropriate professional fees in its time element loss calculation. (See id. at 17–22). In response, Carlex avers that Sompo's argument is insufficient to warrant summary judgment. Even if Carlex's original proof of loss overstated the amount of its covered loss, Carlex responds that there is evidence sufficient to show that Sompo still underpaid under the Insurance Agreement and that Sompo fails to consider the nine separate ways Carlex believes Sompo breached the Insurance Agreement. (See Doc. No. 1-1 ¶ 31).

15

The Court again agrees with Carlex. As an initial matter, for the reasons discussed above, there is ample evidence in the record to create a genuine dispute of material fact on whether Sompo breached the Insurance Agreement by failing to pay Carlex the entire claim amount. See supra, Section III.1.A, B. Carlex's second argument about Sompo failing to properly consider the scope of its breach of contract claim is also well-taken. For example, absent from Sompo's argument is *any* discussion regarding some of the theories of breach Carlex alleges, including Sompo's alleged "[f]ail[ure] to conduct an adequate investigation of Carlex's losses," or [f]orcing Carlex to conduct its own loss investigation," among other alleged breaches.[5] (Doc. No. 1-1 ¶ 31). Accordingly, because Sompo does not carry its burden of establishing there is no genuine dispute of material fact on its alleged breach of the Insurance Agreement, the Court will deny its motion on this claim.

2. Declaratory Judgment

On Count II, Carlex requests a declaration that "Sompo has a duty to indemnify Carlex for at least $65,910,544.00 in covered loss adjustment expenses and time element and contingent time element losses, plus interest at the legal rate and attorney's fees." (Doc. No. 1-1 at 34). Sompo moves for summary judgment on this claim, again arguing that it is undisputed that Sompo does not owe Carlex the amount in question. In response, Carlex again emphasizes that there are genuine disputes of material fact on the total amount owed to Carlex, and notes that Sompo improperly narrows Count II by construing it as related to a specific amount rather than Sompo's general duty to indemnify Carlex for its losses. (See Doc. No. 70 at 16).

---

[5] To the extent the Insurance Agreement does not have terms providing for such duties, because Sompo does not make any argument to this effect, the Court need not consider it. Sommer v. Davis, 317 F.3d 686, 691 (6th Cir. 2003) (party abandons any argument not raised in opening brief).

16

The Court has no difficulty denying Sompo's motion on Count II. Notably, both parties fail entirely to address a threshold issue with Carlex's declaratory judgment claim: whether this Court should exercise its jurisdiction over it at all. See Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984) (explaining the factors courts consider in deciding whether to exercise jurisdiction over a declaratory judgment claim). Even so, because the declaratory claim largely mirrors the breach of contract claim, will rise or fall with it, and will help to resolve the legal relations between the parties, the Court will exercise its discretion to retain jurisdiction. See id.

In doing so, it is appropriate to deny Sompo's motion on Count I for the same reasons it denied its motion on Count II. Specifically, the Court agrees with Carlex that Sompo's arguments for summary judgment are easily disposed of, given the various genuine disputes of material fact regarding the amount of claim loss Carlex is entitled to. See supra, Section III.1.A, B. Given these deficiencies in Sompo's motion, it will be denied as to this claim.

## IV. CONCLUSION

For the foregoing reasons, Sompo's Motion for Summary Judgment (Doc. No. 65) will be denied, and this case will proceed to trial as scheduled.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE